UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                Crim. No. 17-3563 MV

GABRIEL TRUJILLO,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Gabriel Trujillo's Motion to Suppress Evidence, filed January 11, 2018 [Doc. 15]. The Court held an evidentiary hearing on May 8, 2018. Having reviewed the briefs, testimony, exhibits, and relevant law, the Court denies the Motion for the reasons below.

## BACKGROUND

This case concerns the inventory search of Gabriel Trujillo's vehicle and locked backpack subsequent to his arrest. The following represents the Court's findings of fact, based on the evidence submitted, as well as witness testimony.[1]

On December 6, 2017, at approximately 2:41 a.m., Bernalillo County Sheriff's Deputy Mitchell Skroch was on patrol in the South Valley area of Albuquerque, near Central Avenue SW

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d)'s purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) …, the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

and 64th Street, when a dark-colored sedan traveling westbound passed him at an estimated speed of 60 miles per hour. [Complaint Doc. 2 at 2 (Affidavit of Special Agent Jeffrey Mauldin)]. The speed limit on that part of Central Avenue was 25 miles per hour. [*Id.*] The deputy notified dispatch about the car. [Transcript (Tr.)[2] at 9:20-10:5]. He then turned around and pursued the car, catching up at around Central and Unser. [Tr. at 5:16-21]. The car was traveling south on Unser, and Deputy Skroch followed. [Tr. at 6:23-24]. The Deputy first engaged his lights and then activated his siren in an attempt to conduct a traffic stop. [Tr. 10-16]. The car did not stop, but continued to drive at about the speed limit. [Tr. at 7:2-7] By this time, the Deputy could tell that the vehicle was a Ford Mustang. [Tr. at 13:22].

About a half mile south of Central, the car got into the left-hand turn lane to turn eastbound on Bridge. [Tr. at 7:8-9]. The driver rolled down his window, and Deputy Skroch saw him sprinkle something out the window. [Tr. at 7:15-17]. It did not appear to be consistent with a cigarette or a cigarette butt. [Tr. at 7:18-20]. Based on his training and experience, Deputy Skroch believed the substance was a controlled substance. [Tr. at 11:23-24]. The driver then turned eastbound onto Bridge, continuing to fail to yield to the Deputy's emergency equipment. [Tr. at 8:3-4]. Eventually, the car turned into the entrance to a gated community, and stopped at the gate. [Tr. at 8:4-7] The car was blocking the gate. [Tr. at 8:19-20].

Deputy Skroch conducted a felony traffic stop, drawing his department-issue handgun and giving the driver commands from his car window without approaching. [Tr. at 8:22-9:2]. Deputy Skroch testified that, based on his training and experience, felony traffic stops are conducted either in high-risk situations involving people who are fleeing from law enforcement or failing to yield, or when the officer believes could have the potential to do harm to the officer. [Tr. at 9:9-11].

---

[2] References to the Transcript are to the Draft copy.

The driver of the car complied with Deputy Skroch's instructions, first sticking his hand out the window and opening the door, and then, pursuant to the deputy's instructions, walking backwards toward him. [Tr. at 9:12-19]. Another Sheriff's Deputy arrived at the scene, and Deputy Skroch's partner placed the driver in handcuffs. [Tr. at 10:9-19]. Looking through the window of the vehicle, Deputy Skroch could see a Glock handgun in a holster with what appeared to be a magazine, both tucked between the driver's seat and the center console. [Tr. at 14:1-4]. He could also see a Sig Sauer handgun with another magazine and a holster on the passenger seat in the front. [Tr. at 14:5-6]. In the backseat, the deputy could seek what looked like a rifle case. [Tr. at 14:6-7].

Deputy Skroch arrested the driver for failing to pull over and sprinkling the substance out the window. [Tr. at 11:4-9]. In court, he identified the Defendant, Gabriel Trujillo, as the individual he pulled over during the December 6, 2017, traffic stop. [Tr. at 12:14-21].

The deputy testified that Mr. Trujillo appeared to be wearing multiple layers of clothing, and the other deputy told Deputy Skroch it was a body armor vest. [Tr. at 12:25-13:2.] Deputy Skroch had never before encountered anyone driving around wearing body armor. [Tr. at 13:6-7].

Deputy Skroch placed Mr. Trujillo under arrest and read him the *Miranda* warning, using his Miranda warning card. [Tr. at 14:20-15:3, 22; Ex. 1, *Miranda* warning card]. Afterward, Mr. Trujillo agreed to speak to him. [Tr. at 15:4-6]. Mr. Trujillo told Deputy Skroch he did not stop because he was looking for a safe spot to pull over. [Tr. at 15:8-9]. He also told the deputy that he was wearing body armor because his ex-girlfriend's friends made threats against his life, and that he had the handguns for the same reason. [Tr. at 15:9-12] He stated that everything in the vehicle was his, including a green army backpack, and that the substance he had sprinkled out the

3

window was a cigarette. [Tr. at 15:15-19]. The deputy testified that Mr. Trujillo did not appear to have been drinking. [Tr. at 15:22-16:13].

Deputy Skroch testified that he had decided to arrest Mr. Trujillo as soon as Mr. Trujillo said he had been looking for a safe spot to pull over, because the deputy knew there had been multiple safe spots to pull over. [Tr. at 16:16-18]. Specifically, Unser going southbound from Central to Bridge has a shoulder big enough for a vehicle to fit there with room left over, and the street is well lit. [Tr. at 16:21-17:3].

Deputy Skroch determined that, since he was going to arrest the Mr. Trujillo, Mr. Trujillo's car would have to be towed pursuant to Sheriff's Department policies. [Tr. at 17:6-14, 22:21-23:25; Ex. 2, Towing Procedures, § 311-2; Ex. 3, Search and Seizure without a Warrant, § 321-8]. He explained that the purpose of the inventory is to mark any high-value items to avoid theft and/or accusations of theft of items from the car either at the lot or wherever the car will be held. [Tr. at 19:2-3]. The deputy testified that the primary purpose of inventory searches is to protect law enforcement officers from potential lawsuits and wrongdoings. [Tr. at 34:24-35:5]. He viewed the faithful execution of an inventory search as requiring that he search the backpack. [Tr. at 21:13-15].

The upper compartment of the green backpack, which the deputy described as the main compartment, had a small luggage lock securing its contents. [Tr. at 19:20-20:3, 26:3-5]. Deputy Skroch did not have a key to the lock, so he "defeated" the lock by pulling on it with his hand. [Tr. at 20:6-7]. At the time, he believed he had broken the lock, so he noted that in his report. [Tr. at 37:15-38:2]. However, when presented with the lock and a key during the hearing, Deputy Skroch was able to open the lock using the key and, when the lock was closed, he could not pull

4

the lock open without the key. [Tr. at 24:6-25:2]. Accordingly, it appears that the lock was not damaged. There was also no damage to the backpack itself. [Tr. at 20:13-15].

Deputy Skroch testified that he opened the backpack to see what was inside because he knew that backpacks can contain valuable items such as laptops, jewelry and other personal belongings, and he wanted to make sure he documented the contents. [Tr. at 20:23-21:3, 33:21-25].

Inside the backpack, Deputy Skroch found a 1911 handgun and ammunition; half a pound of a crystal-like substance he knew to be methamphetamine; and a shotgun shell box that contained four bundles of U.S. currency. [Tr. at 21:16-22].

The deputy testified that before he saw the methamphetamine, he had no reason to suspect drug trafficking or drug dealing. [Tr. at 21:23-22:1].

During the search of the car, in addition to the two handguns he had seen in the front seat, Deputy Skroch found a Sig Sauer 556 rifle with a long-range scope and a 60-round magazine inside the rifle bag. [Tr. at 19:8-17].

Drug Enforcement Agent Jeffrey Mauldin testified that the lock and key came into his possession on the morning of the incident and was in his possession at all times prior to the hearing. [Tr. at 40:16-41:15, 42:1-23].

Captain Andrea Taylor testified regarding Bernalillo County Sheriff's Department inventory search procedures and training. She stated that a deputy is required to have a vehicle towed incident to arrest, and other specific other circumstances. [Tr. at 47:5-16]. In addition, the Sheriff's Department has a policy that deputies are required to open closed containers in cars after being towed. [Tr. at 48:19-22]. Captain Taylor explained that this protects the Department as well as the owner of the vehicle, as the officers receiving the evidence have "to know what's in

that container." [Tr. at 48:24-49:20]. The policy that those receiving the evidence ("techs") cannot accept closed containers is "for safety reasons." [Tr. at 49:21-24]. Regarding locked containers, an officer may damage an external lock as long as the container is still rendered operable. [Tr. at 50:4-5]. However, if the lock is integral to the container, the deputy would need to get a search warrant. [Tr. 50:6-12]. Captain Taylor acknowledged that there is no written policy explicitly requiring deputies to break locks before logging the containers into the department's evidence. [Tr. at 53:11-22]. There is a written policy, however, that the deputy must inventory anything going into evidence or to the jail. [Tr. 53:22-24].

## PROCEDURAL BACKGROUND

On December 19, 2017, Mr. Trujillo was charged in a two-count Indictment with Possession with Intent to Distribute 50 Grams and More of a Mixture and Substance Containing Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and Possession of a Firearm During the Commission of Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c). [Doc. 11] On January 11, 2018, he filed the instant Motion to Suppress, arguing that his consent to the search was involuntary and did not comply with applicable Bernalillo County operating procedures. [Doc. 15] Mr. Trujillo also argued that any statements to law enforcement after the traffic stop should be suppressed. [*Id.*] On January 24, 2018, the United States filed a Response in opposition to Mr. Trujillo's Motion to Suppress. [Doc. 17]. On January 26, 2018, Mr. Trujillo filed a Reply to the United States' Response. [Doc. 19]. The Court held an evidentiary hearing on May 8, 2018, and took the Motion under advisement. Deputy Mitchell Skroch, Drug Enforcement Agent Jeffrey Mauldin, and Captain Andrea Taylor testified at the hearing.

**STANDARD**

**I.     Statements While in Custody**

Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), "a confession obtained during a 'custodial interrogation' may not be used by the prosecution against the defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination." *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008). The Supreme Court held that the person being interrogated in custody must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

**II.     Inventory Search of Locked Container**

The Fourth Amendment protects "the right of the people to be secure in their . . . effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search implicating the Fourth Amendment occurs when the government invades a person's "legitimate expectation of privacy." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). A search undertaken without a warrant, subject only to a few, well-established exceptions, is *per se* unreasonable under the Fourth Amendment. A seizure implicating the Fourth Amendment occurs when the government meaningfully interferes with an individual's possessory interests in their property. *See, e.g.*, *U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). When a defendant moves to suppress evidence obtained as a result of an allegedly unconstitutional search, he has the burden of demonstrating a subjective expectation of privacy that society is prepared to recognize as reasonable. *See United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995).

Police may inventory impounded property to "protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987) (citing *South Dakota v. Opperman*, 428 U.S. 364, 370 (1976)).

Citing *Opperman*, the Tenth Circuit has stated, "[g]ranting police discretion over whether to impound and inventory a vehicle is permissible so long as officers exercise that discretion according to standardized criteria, and not just bad faith or for the sole purpose of investigation." *United States v. Sanders*, 796 F.3d 1241, 1245 (10th Cir. 2015); *see also Florida v. Wells*, 495 U.S. 1 (1990) (holding that standardized criteria, or established routine, must regulate opening of containers found during inventory searches, and police may be allowed sufficient latitude to decide whether a particular container should or should not be opened). In *Sanders*, the Court held that "impoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale." *Id.* at 1248.

## DISCUSSION

### I. Mr. Trujillo's Statements

Statements that are voluntarily obtained during a custodial interrogation after procedural safeguards of warning the individual of his or her rights do not violate the Fifth Amendment privilege against self-incrimination. *Miranda*, 384 U.S. 436. Here, Deputy Skroch and Mr. Trujillo had a consensual encounter. Mr. Trujillo followed the directions that Deputy Skroch provided. Deputy Skroch placed Mr. Trujillo under arrest and read him the *Miranda* warning, using his Miranda warning card. Afterward, Mr. Trujillo agreed to speak to him. Although Mr. Trujillo has moved for the suppression of any statements he made, his Motion to Suppress

8

Evidence and Supporting Memorandum does not allege any deficiencies in the *Miranda* warnings given by Deputy Skroch. Further, he did not dispute Deputy Skroch's testimony at the hearing that *Miranda* warnings were given, nor cite any reason for which the Court might find Mr. Trujillo's statements to be involuntary. Accordingly, the Court finds that Mr. Trujillo's statements were voluntarily given after being fully informed of his rights and are therefore admissible.

## II.     Inventory Search

Because Deputy Skroch followed standardized criteria set forth by the Bernalillo Sheriff's Department and acted in good faith pursuant to those established policies, the Court finds that the search of Mr. Trujillo's locked backpack was proper and did not violate his Fourth Amendment rights. Inventory searches are a recognized exception to the Fourth Amendment's warrant requirements. Where a standardized, reasonable policy is in place and police do not abuse their discretion, inventory searches of even locked containers do not violate an individual's Fourth Amendment right to be free of unreasonable searches or seizures. *See Bertine*, 479 U.S. 367; *Opperman*, 428 U.S. 364; *Wells*, 495 U.S. 1.

In *Bertine*, Steven Bertine was arrested for driving his van while under the influence of alcohol. *Id*. at 368. The backup officer inventoried the van in accordance with local police procedures, which required an inspection and inventory of impounded vehicles. *Id.* at 369. The officer opened a closed backpack in which he found controlled substances, cocaine paraphernalia, and a large amount of cash. *Id.* Bertine moved to suppress the evidence on Fourth Amendment grounds. *Id.* The state court acknowledged that "search of the backpack was done for the purpose of protecting the owner's property, protection of the police from subsequent claims of loss or stolen property, and the protection of the police from dangerous instrumentalities." *Id.* at 369-70. Although the Colorado trial court determined the search did not violate Bertine's rights under the

9

Fourth Amendment, they granted the motion to suppress on the grounds that the inventory search violated the Colorado Constitution. *Id.* at 370. The Colorado Supreme Court affirmed, but based its ruling on the United States Constitution and held that the inventory search violated the Fourth Amendment. *Id.*

The Supreme Court granted certiorari, noting that the "policies behind the warrant requirement are not implicated in an inventory search, nor is the related concept of probable cause." *Id.* at 371 (internal citations omitted). The Court found that the governmental interests justifying the inventory searches in *Opperman* and *Illinois v. Lafayette*, 462 U.S. 640 (1983), were the same as in *Bertine*: police were potentially responsible for the property taken into their custody. *Bertine*, 479 U.S. at 373. The Court concluded that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment" and police should not be required to weigh individual and social interests given their limited time and expertise. *Id.* at 374-75 (citing *Lafayette*, 462 U.S. at 648; *see also United States v. Ross*, 456 U.S. 798, 821). Finally, the Court found that of the police had exercised their discretion in accordance with the "standardized criteria" of their policies and that there was "no showing that the police chose to impound Bertine's van in order to investigate suspected criminal activity." *Id.* at 375-76.

In *Florida v. Wells*, the Supreme Court considered an inventory search conducted by a highway patrol trooper without any highway patrol policy on opening closed containers encountered during an inventory search. 495 U.S. at 2-3. The trooper opened the trunk of a car, opened a locked suitcase in the trunk of the car, and discovered a garbage bag containing a large amount of marijuana. *Id.* The Court held that, absent a policy on opening closed containers during an inventory search, the search was not sufficiently regulated to satisfy the Fourth Amendment and, therefore, the marijuana was properly suppressed by the Florida Supreme Court. *Id.* at 5. The

Court reiterated, however, that "'nothing . . . prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Id.* at 3–4 (quoting *Bertine*, 479 U.S. at 375). Rather, an inventory search should promote administrative purposes. *Opperman*, 428 U.S. 364. The Court in *Wells* thus set parameters within which law enforcement might establish a legitimate inventory search policy:

> A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purpose of an inventory search does not violate the Fourth Amendment.

*Id.* at 4. Within the constraints of a policy or procedure, officers are thus able to exercise discretion in deciding whether or not to open a particular container. *Id.*

In this case, the Rules and Regulations of the Bernalillo County Sheriff's Department require that, after the arrest of a driver, the vehicle must be towed if the verified registered owner of the vehicle is not present. [Ex. 2] Additionally before a vehicle is towed, "[a] complete inventory must be taken of all property left in the towed vehicle." [*Id.* § 311-2(C)]. The inventory search is described as "[a] search conducted to protect and safeguard an individual's property, provide for the safety of the deputy and others, as well as protect the Department against claims or lawsuits for loss or destruction of private property." [Ex. 3].

The Rules and Regulations further state that "[c]ontainers found during an inventory search of a vehicle can be opened if accomplished without damage to the container and the search is conducted in accordance with the Department SOP." [*Id.* § 321-8(B)(4)(d)].

Mr. Trujillo contends that the Bernalillo County Sheriff's Department did not have a

written policy in effect at the time of his arrest regulating inventory searches of closed containers. Although the Department's policies did not explicitly say deputies "must open" closed containers, Deputy Skroch acted within the scope of clear policies that set forth reasons for opening closed containers, as described in *Wells*. The record is clear that in his encounter with Mr. Trujillo, Deputy Skroch's search was undertaken pursuant to "standard criteria or established routine" of the Bernalillo Sheriff's Department that instructs deputies to perform an inventory of the impounded vehicle. Deputy Skroch testified that he opened the backpack because he knew backpacks tend to contain valuable items, and he wanted to make sure to document the contents of the backpack to both secure the items and not be accused of theft. [Tr. 33:21-25]. The Court has considered the testimony of Deputy Skroch, Agent Muldin, and Captain Taylor, and finds their testimony to be credible. The inventory policies are intended to safeguard the individual's property, protect the Sheriff's Department against claims, and secure the safety of all involved. Deputy Skroch's actions were in accordance with the standardized criteria, and there was no indication in the testimony that the purpose of his search was to discover evidence of criminal activity. Furthermore, neither the backpack nor the lock was damaged.

The Bernalillo County Sheriff's Department has standardized criteria or established routines regulating the opening of containers found during inventory searches. Defense counsel argued at the suppression hearing that under *Wells*, because the Department does not have a policy specifically permitting officers to open Mr. Trujillo backpack, the search "was not sufficiently regulated to satisfy the Fourth Amendment." [Tr. at 59:19-60:1, 61:13-62:12]. However, in *Wells*, the Supreme Court affirmed suppression "where highway patrol had *no policy whatever* with respect to opening of closed containers encountered during an inventory search." 495 U.S. at 4–5 (emphasis added).

The defense's argument fails because the Department had a policy governing the search at issue, and Deputy Skroch acted in accordance with and pursuant to this policy. The testimony indicates that Deputy Skroch did not open the backpack for the purpose of uncovering criminal conduct. Under *Wells*, while "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence, . . . [a] police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened." *Id.* Here, there is no indication that Deputy Skroch's intent was anything other than the purposes indicated in the Department's policies. Rather, Deputy Skroch testified that he "defeated" the lock in order to inventory the contents of the backpack before it went in to evidence to safeguard Mr. Trujillo's belongings, provide for the safety of those who would come into contact with the backpack, and protect the Department against claims of loss or destruction of property. Captain Taylor confirmed that these are the purposes of the Department's policies regarding inventory searches. [*See, e.g.*, Tr. at 18-19, 21, 48-49].

The Court's ruling that opening the backpack was done consistent with the goals of the Department's policies is further underscored by the fact that neither the backpack nor the lock was damaged as a result of the inventory search. At the hearing, Deputy Skroch was presented with the lock and its key. [Tr. at 24: 2-8] In front of this Court, Deputy Skroch demonstrated that he was unable to open the lock by hand, that the key opened the lock, and he testified that the backpack was in good working shape. [Tr. at 24:18-26:2]. This showing of an absence of any damage to Mr. Trujillo's property is consistent with the Department's lawful inventory search policy. Additionally, there is no indication that Deputy Skroch was "rummaging in order to discover incriminating evidence," *Wells*, 495 U.S. at 4.

Accordingly, because Deputy Skroch followed standardized criteria set forth by the

Bernalillo Sheriff's Department and acted in good faith pursuant to those established policies, the Court finds that the search of Mr. Trujillo's locked backpack was proper and did not violate his Fourth Amendment rights. The seized contents are admissible.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Mr. Trujillo's Motion to Suppress [Doc. 15] in its entirety.

Dated this 29th day of October, 2018.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Jack Mkhitarian | Paul Mysliwiec |
| *Attorney for Mr. Trujillo* | *Assistant United States Attorney* |