## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                        Crim. No. 17-3563 MV

GABRIEL TRUJILLO,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Gabriel Trujillo's Second Motion to Suppress Evidence. Doc. 43. The government filed a timely Response in opposition [Doc. 47] and Mr. Trujillo filed a Reply [Doc. 48]. The Court then held an evidentiary hearing on the Motion on October 11, 2019 [Doc. 56] and the parties submitted supplemental briefing as requested by the Court. Docs. 58 and 59. Having considered the briefs, testimony, exhibits, relevant law, and being otherwise fully informed, the Court finds that the Motion is well-taken and will be **GRANTED**.

## BACKGROUND

This Motion concerns the decision of a Bernalillo County Sheriff's deputy to impound a vehicle incident to arrest, a decision that allowed him to conduct a warrantless inventory search of the vehicle and eventually discover the drugs leading to the charges in this case. The legality of the inventory search is not at issue here; as explained below, the Court found it lawful in denying Mr. Trujillo's first Motion to Suppress Evidence. *See* Doc. 31. What the Court now finds unconstitutional is the deputy's prior decision to impound the vehicle pursuant to a Sheriff's Department policy that calls for the impoundment of all vehicles upon the arrest of the driver with only one limited exception. Because the deputy's application of that policy in this case foreclosed the consideration of reasonable alternatives, bypassed the issue of consent, and overrode the

1

absence of a legitimate community-caretaking rationale, the impoundment was unconstitutional and the fruits of the resulting search must be suppressed.

## I.     Facts

The Court laid out most of the facts pertinent to this Motion in its Memorandum Opinion and Order denying Mr. Trujillo's first Motion to Suppress Evidence. Doc. 31 at 1–6. The Court now summarizes those earlier findings of fact, which it supplements with additional findings based on the testimony and exhibits from the October 11, 2019 evidentiary hearing on the instant Motion.[1]

On December 6, 2017, at approximately 2:41 a.m., Bernalillo County Sheriff's Deputy Mitchell Skroch was on patrol in the South Valley area of Albuquerque, near Central Avenue SW and 64th Street, when a dark-colored sedan traveling westbound passed him at an estimated speed of 60 miles per hour. Doc. 31 at 1–2. The speed limit on that part of Central Avenue was 25 miles per hour. *Id*. at 2. The deputy notified dispatch about the car. *Id*. He then turned around and pursued the car, catching up at around Central Avenue and Unser Boulevard. *Id*. The car was traveling south on Unser, and Deputy Skroch followed. *Id*. The deputy first engaged his lights and then activated his siren in an attempt to conduct a traffic stop. *Id*. The car did not stop, but

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d)'s purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) ..., the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

continued to drive at about the speed limit. *Id.* By this time, the deputy could tell that the vehicle was a Ford Mustang. *Id.*

About a half mile south of Central, the car got into the left-hand turn lane to turn eastbound on Bridge Boulevard. *Id.* The driver rolled down his window, and Deputy Skroch saw him sprinkle something out of it. *Id.* The discarded object did not appear to be a cigarette or a cigarette butt, and based his training and experience, Deputy Skroch believed it to be a controlled substance. *Id.* The driver then turned eastbound onto Bridge, continuing to fail to yield to the deputy's emergency equipment. *Id.* Eventually, the car turned into the entrance to a gated community and came to a stop. *Id.*

Precisely where the car was located when it came to a stop, and its position relative to the entrance to the gated community, is of central importance to the instant Motion. A picture taken by the defense shows that the entranceway to the community consists of an unmarked roadway leading up to a gate. Doc. 43 Ex. 1. The roadway is divided by a median into two sections as the gate approaches: a section on the right-hand side for vehicles to enter the community, and a section on the left-hand side for vehicles to exit. *See id.* From the picture, it appears that at least two cars can fit side-by-side on each the entrance and exit side of the roadway. *See id.* Because the median does not run all the way to Bridge, a section of the road farther back from the gate is undivided. *See id.* Although the picture taken by the defense shows that the curbs on both sides of the entranceway are now painted with the words "No Parking," those markings do not appear to have been present when Mr. Trujillo stopped there on the night he was arrested. *See* Doc. 57 at 53:12–54:15.

At the October 11, 2019 evidentiary hearing, the defense also submitted two pictures of Mr. Trujillo's vehicle taken on the night in question. One of the pictures shows that the Mustang

was stopped on the right-hand entrance side of the roadway facing towards the gate. *See* Defendant's Exhibit B. The car was mostly parallel with the curb as it was stopped, although its tail end was angled slightly away from it. *Id*. The car was also set off from the curb by what appears to be a few feet. *Id*. The photographs additionally show that Mr. Trujillo had stopped far enough back from the gate such that the Mustang remained in the part of the roadway not yet divided by the median. *Id*.

At the hearing, Deputy Skroch testified that the vehicle "was parked on the right side, but not all the way to the right curb." Doc. 57 at 15:15–16. He further testified that the Mustang was "in the way of people trying to enter the gate" [*Id*. at 15:16–17] and that there would not have been enough room for another vehicle to enter the community even if it was moved to the curb [*Id*. at 20:21–24]. The credibility of that statement is called into question by the picture of the entranceway taken later by the defense. *See* Doc. 43 Ex. 1. Although it does not depict Mr. Trujillo's Mustang on the night in question, the picture clearly shows that the entranceway is wide enough to allow a vehicle to proceed into the community past another that was parked along the right-hand curb. *Id*. Deputy Skroch additionally testified that while traffic was on the lighter side at the time of the stop, it was "starting to pick up at that point in time because people were starting to leave that gated community, in particular, to head to work." Doc. 57 at 20:10–12.

After Mr. Trujillo turned into the entranceway of the gated community, Deputy Skroch conducted a felony traffic stop, drawing his service weapon and giving commands from his car window without approaching. Doc. 31 at 2. Mr. Trujillo complied and was placed into handcuffs by the deputy's partner. *Id*. at 3. After receiving *Miranda* warnings, Mr. Trujillo stated that he did not immediately yield to the deputies' emergency lights because he was looking for a safe place to pull over. Doc. 31 at 3. Not believing this explanation, Deputy Skroch decided to arrest

him. *Id.* at 3–4. The deputy then approached the Mustang to visually clear it for other occupants. Doc. 57 at 33:13–16. When he looked through the window of the car, he noticed several firearms, including a Glock handgun, a Sig Sauer handgun, and what appeared to be a rifle case in the backseat. Doc. 31 at 3.

Deputy Skroch expressed concern at the recent evidentiary hearing that Mr. Trujillo's car might have been burglarized had he left it unattended with the firearms in plain sight. Doc. 57 at 17:17–24. However, the deputy's testimony made clear that he had decided to tow the Mustang *before* he had visually cleared it and observed the firearms. He discussed the timing of his decision to impound the car during the following exchange with defense counsel:

> **Q:** Okay. So it was at some point during the conversation you had with Mr. Trujillo that you decided you were going to impound this vehicle and tow it?
>
> **Skroch:** It was–I knew that the vehicle was going to get towed.
>
> **Q:** When did you know that?
>
> **Skroch**: As soon as the handcuffs were on.
>
> **Q:** So even before you visually cleared the car?
>
> **Skroch:** Yes, sir.
>
> **Q:** You knew it was going to get towed?
>
> **Skroch:** Yes, sir.

Doc 57. at 34:1–10. Defense counsel further clarified:

> **Q:** So if I understand your testimony correctly, since it was before you cleared the vehicle that you made the decision that the vehicle was getting towed, you had not yet seen the firearms in the vehicle, right?
>
> **Skroch:** Yeah.
>
> **Q:** You saw the firearms after you cleared the vehicle visually?
>
> **Skroch:** Yeah.

*Id.* at 35:18–24.

The deputy's testimony from the hearings on both of Mr. Trujillo's motions to suppress also makes clear that the immediacy of his decision to tow the car was a result of the Bernalillo County Sheriff's Department's impoundment policy in effect at that time.[2] That policy is set forth in Sections 311-1 and 311-2 of the Department's Rules and Regulations. Doc. 17 Ex. 1 at 1–2. Section 311-1 lists a number of circumstances under which vehicles will be towed "at the direction of Department personnel." *Id.* at 1. Subsection 311-1(D) states that a vehicle will be towed "[w]hen the driver has been incapacitated, hospitalized, arrested, and/or when the vehicle cannot be released to a registered owner as verified by the MVD." *Id.* Section 311-2(D) then clarifies that "[u]pon arrest of the driver of the vehicle, the arresting Deputy may release the vehicle to the verified registered owner of the vehicle if they are present at the time of arrest, otherwise, the vehicle will be towed pursuant to this policy." *Id.* at 2.

Consistent with the policy, Deputy Skroch testified at the hearing on Mr. Trujillo's first Motion to Suppress that he believed he had no choice but to tow the car following his decision to arrest. When asked, "[a]fter you decided to arrest Mr. Trujillo, do you believe that there were any procedures you were required to follow with respect to the Mustang?" he responded, "Yes, sir. I believe that I had to tow the vehicle." Doc. 30 at 19:5–8. The deputy then explained, "Mr. Trujillo was under arrest. There was no one else to drive the vehicle, and our policy is that we have to tow it, in that case, if there's no registered owner present." *Id.* at 19:11–13. Deputy Skroch testified to similar effect at the second evidentiary hearing. *See* Doc. 57 at 40:17–18.

The Court also received testimony in both evidentiary hearings about how the deputy's immediate decision to tow under the impoundment policy was not unique to this case. To the

---

[2] The Court is unsure from the record whether the Sheriff's Department has since amended its impoundment policy, or whether the same policy remains in effect today.

contrary, Deputy Skroch and Captain Andrea Taylor, another official with the Bernalillo County Sheriff's Department, made clear that pursuant to the policy, deputies in Bernalillo County tow vehicles in virtually all cases of arrest. At the first evidentiary hearing, Captain Taylor was asked about "the circumstances under which a deputy is required to have a vehicle towed after a traffic stop." Doc. 30 at 49:12–14. She responded:

> Incident to arrest, if the subject has what's called a 122-G, which would be a suspended/revoked driver's license, there's no registration, insurance, if, say, another person in the vehicle does not have a driver's license, is intoxicated, can't drive, we do tow under DWI *and basically all arrests that happen.*

*Id.* at 49:15–19 (emphasis added). At the more recent evidentiary hearing on Mr. Trujillo's Second Motion to Suppress, Deputy Skroch gave a similar answer. When asked when he impounds a vehicle as evidence of a crime, he responded, "I would say that 99 percent of the time that I stop a car and arrest the driver, the car gets towed. I don't know how else to answer that question." Doc. 57 at 30:1–5.

Deputy Skroch's recent testimony further confirmed that the policy as written does not provide for the consideration of alternatives to the impoundment of an arrestee's vehicle. The deputy agreed that Section 311-2 does not mention alternatives to towing and said that he could not recall any other part of the policy that does. *Id.* at 27:17–24. He additionally agreed that the policy does not contemplate either the arresting deputy or the driver contacting anyone to come get a vehicle, nor does it provide for the driver to secure a private tow. *Id.* at 35:7–17. Consistent with the policy, Deputy Skroch does not appear to have explored alternatives to towing Mr. Trujillo's vehicle in the present case. He did not ask Mr. Trujillo, who remained on scene, whether he had anyone he could call to arrange for the pickup up the vehicle [*Id.* at 43:4–21] nor did he

give Mr. Trujillo the option of securing the firearms that he was concerned about [*Id*. at 42:15–18]. The deputy also did not ask for Mr. Trujillo's consent to tow the car.[3] *Id*. at 44:2.

As to whether the entranceway to the gated community was a public or private road, Deputy Skroch testified that he determined it to be public property "based on its location, and its proximity to an active roadway with entrances from an active roadway." *Id*. at 28:16–21. He further explained that he believed the road to be public because "any vehicle can drive there, anyone can stand there." *Id*. at 28:24–25. He nevertheless agreed with defense counsel that there are examples of private property that anyone can access, like the parking lot of a private business. *Id*. at 29:1–5.

As to whether he considered the Mustang to be evidence of a crime, Deputy Skroch testified that because Mr. Trujillo was in the vehicle when he failed to yield to the deputy's emergency lights, it was part of the scene of the investigation. *Id*. at 29:16–19. He additionally testified that the evidence of drugs and firearms it contained would qualify it as evidence, although he did not discover those items until after the decision to impound. *Id*. at 31:2–5, 35:18–24.

Following his decision to impound Mr. Trujillo's vehicle, Deputy Skroch conducted an inventory search pursuant to Department policy. Doc. 31 at 4. That policy requires deputies to complete an inventory of "all property" left in a vehicle to be towed. Doc. 31 at 11. It also authorizes them to open containers found during the search if the container can be opened without damage and in accordance with the Department's policies. *Id*. During the inventory search, Deputy Skroch found a green backpack, which he opened by defeating a small luggage lock. *Id*. at 4. Inside the backpack, the deputy found a 1911 handgun and ammunition; half a pound of a

---

[3] According to the complaint, Mr. Trujillo explained that he had purchased the Mustang three days prior and had not yet changed the registration. Doc. 2 at 3. A subsequent check revealed that the car was registered to a person by the initials "R.J." in Jarales, New Mexico. *Id*. at 4. There is no indication that the car was reported stolen.

crystal-like substance he knew to be methamphetamine; and a shotgun shell box that contained four bundles of U.S. currency. *Id*. at 5.

Mr. Trujillo was subsequently charged in a two-count indictment with Possession with Intent to Distribute 50 Grams and More of a Mixture and Substance Containing Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); and Possession of a Firearm During the Commission of Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c). Doc. 12.

## II.    Procedural Background

On January 11, 2018, Mr. Trujillo filed his first Motion to Suppress Evidence, arguing among other things that his Fourth Amendment rights were violated when Deputy Skroch opened the locked backpack during the inventory search. Doc. 15 at 4.  After hearing from Deputy Skroch, Captain Taylor, and Drug Enforcement Agent Jeffrey Maudlin at the first evidentiary hearing in this case, the Court found the inventory search to be constitutional because Deputy Skroch "followed standardized criteria set forth by the Bernalillo Sheriff's Department and acted in good faith pursuant to those established policies." Doc. 31 at 9.  Of importance here, the "standardized criteria" that the Court focused on in resolving Mr. Trujillo's first Motion to Suppress were the Department's Rules and Regulations pertaining to inventory searches, not impoundment. *Id*. at 11.

Mr. Trujillo then filed a Motion for Reconsideration on October 31, 2018, arguing that he had found new evidence in discovery about the backpack lock that the Court had not considered. Doc. 32 at 1–2.  The Court denied the Motion, noting that defense counsel had not objected to the authenticity of the lock at the hearing and had access to the relevant discovery files well before it.

Doc. 37 at 6. Mr. Trujillo's first defense counsel withdrew shortly thereafter [Doc. 38, 39] and new counsel was appointed to represent him [Doc. 40].

On April 24, 2019, Mr. Trujillo filed the instant Motion. Doc. 43. In it, he argues that Deputy Skroch's decision to impound his car, which led directly to the inventory search, was unconstitutional under *United States v. Sanders*, 796 F.3d 1241 (2015), because the Department's impoundment policy is facially invalid and because the deputy lacked a reasonable, non-pretextual community caretaking rationale to support the impoundment. Doc. 43 at 7–10.

In response, the government first argues that the Court should construe the instant Motion as another motion to reconsider because it heard testimony about the impoundment policy when deciding Mr. Trujillo's first Motion to Suppress. Doc. 47 at 1. Under that higher standard, the government submits, he cannot prevail. *Id.* at 2. On the merits, the government argues that the impoundment policy is lawful because *Sanders* does not require officers to consider alternatives to towing and because the policy includes the exception for a present registered owner to take possession of the vehicle. *Id.* at 3. It further argues that Deputy Skroch's decision to impound the car was reasonable because the vehicle was obstructing traffic and because it contained firearms in plain view. *Id.* at 3–4.

In reply, Mr. Trujillo submits that even if the Court were to consider his Motion a motion to reconsider, he has met the standard for reconsideration because "manifest injustice" would result from the denial of his meritorious Fourth Amendment claim. Doc. 48 at 4.

On October 11, 2019, the Court held the evidentiary hearing on Mr. Trujillo's Second Motion to Suppress. Doc. 56. At the hearing, the Court advised the parties that it would not construe the Motion as a motion to reconsider because it only considered the impoundment issue in passing when deciding Mr. Trujillo's first Motion to Suppress. Doc. 57 at 3:15–25. It then

heard again from Deputy Skroch, whose testimony is described above. Following the hearing, the Court ordered supplemental briefing on two questions: (1) whether Sections 311-1(D) and 311-2(D) of the Rules and Regulations of the Bernalillo County Sheriff's Department are facially unconstitutional under the Fourth Amendment; and (2) whether and to what extent the Court's analysis of this question should consider the testimony of Captain Taylor and Deputy Skroch that vehicles in Bernalillo County are towed in almost every case of arrest. Doc. 55. Both parties timely submitted the requested briefing, which the Court has now reviewed. Docs. 58 and 59.

## STANDARD

The government bears the burden of proving that its impoundment of a vehicle satisfies the Fourth Amendment. *Sanders*, 796 F.3d at 1244 (citing *United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992)). The Tenth Circuit recently clarified the law surrounding police impoundments in *Sanders*, where it reviewed the two main strands of Supreme Court caselaw on the subject.

First, in *South Dakota v. Opperman*, 428 U.S. 364 (1976), the Supreme Court held that police officers have the authority to impound a vehicle without a warrant when the impoundment is required by the community-caretaking functions of "protecting public safety and promoting the efficient movement of traffic." *Sanders*, 796 F.3d at 1245. The *Opperman* Court explained:

> In the interests of public safety and as part of what the Court has called community caretaking functions, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

428 U.S. at 368–69.

Although *Opperman* gives officers broad authority to impound vehicles under the community-caretaking rationale, this authority is not unlimited. In *United States v. Pappas*, 735 F.2d 1232 (10th Cir. 1984), the United States District Court for the District of Utah granted a defendant's motion to suppress after police impounded their vehicle from a private lot based on a policy that required impoundment "whenever an arrest takes place, regardless of the circumstances." *Id*. at 1233. In affirming the suppression, the Tenth Circuit declared "*Opperman* cannot be used to justify the automatic inventory of every car upon the arrest of its owner. The justifications for the rule are too carefully crafted for this to be the intent." *Id*. at 1234. It also noted that unlike in *Opperman*, where the owner of the illegally-parked vehicle was "not present to make other arrangements," here there were other alternatives the police could have pursued, such as speaking to the defendant's friends, inquiring if the owner of the bar would allow the car to be left in place, or placing a call to the defendant's family. *Id*. The fact that the police found a loaded .357 Magnum and a sawed-off shotgun in the vehicle did not change the Tenth Circuit's analysis. *Id*. at 1233.

The Tenth Circuit again analyzed the boundaries of *Opperman's* community-caretaking rationale in *United States v. Ibarra*. 955 F.2d 1405 (10th Cir. 1992). There, a Wyoming Highway Patrolman stopped a vehicle traveling eastbound on Interstate 80. *Id*. at 1406. After determining that both the driver and the passenger had expired licenses, the patrolman decided to have the vehicle towed to a nearby town. *Id*. at 1407. The police then conducted an inventory search at the towing lot and discovered a large package containing cocaine. *Id*. at 1407–08. In granting the defendant's motion to suppress, the District of Wyoming found the patrolman's testimony that he impounded the car "because it posed a safety hazard" to be lacking in credibility. *Id*. at 1409.

The Tenth Circuit affirmed, noting its duty to rely on the district court's factfinding unless clearly erroneous. *Id*. It further reasoned that had the vehicle been a "true threat to public safety," the officers would have moved the it to the side of the road while waiting for the tow truck to arrive. *Id*. at 1410. The Court also cited with approval the district court's reasoning that "[i]f in fact a need existed for [defendant] to move his vehicle, he was plainly capable of making those arrangements with a private towing service of his choice to a destination of his choice and he was present and clearly capable of making the arrangements for the safekeeping of his belongings." *Id*. at n.5 (internal quotations and citations omitted). The Tenth Circuit accordingly held that the government had "failed to carry its burden of showing that the impoundment of [the] defendant's vehicle was authorized… by *Opperman*." *Id*. at 1410. It further held that the tainted evidence could not come in through the doctrine of inevitable discovery because "no inventory of the contents of [the] defendant's vehicle could have been conducted but for the unlawful impoundment of the vehicle." *Id*.

Where *Opperman* instructs that certain impoundments are constitutional–namely, those justified by a legitimate community-caretaking rationale–a second line of Supreme Court cases instructs that other impoundments are *unconstitutional*: namely, those not guided by standardized criteria and those pursued as a pretext for further criminal investigation. *Sanders*, 796 F.3d at 1245 (citing *Illinois v. Lafayette*, 462 U.S. 640 (1983)) and *Colorado v. Bertine*, 479 U.S. 367 (1987)).

What the Tenth Circuit sought to provide guidance on in *Sanders* was a third category of impoundments falling in between these poles: "namely, those carried out pursuant to standardized criteria but not justified by the public safety and traffic control goals of *Opperman*." *Sanders*, 796 F.3d at 1245. After reviewing how other circuits have approached the issue, the Court announced its new rule: "the impoundment of a vehicle located on private property that is neither obstructing

traffic nor creating an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale." *Id.* at 1248. For an impoundment to be constitutional under this test, it must satisfy both prongs. *Id.* at 1243.

The Tenth Circuit then explained that the first prong, requiring a standardized policy, "ensures that police discretion to impound vehicles is cabined rather than uncontrolled." *Id.* at 1249. It also made clear, however, that the existence of a standardized impoundment policy does not in and of itself make a decision to impound constitutional: "even if the police were to adopt a standardized policy of impounding all vehicles whose owners receive traffic citations, such impoundments could be invalidated as unreasonable under our precedent." *Id.* (citing *Miranda v. City of Cornelius*, 429 F.3d 858, 865–66 (9th Cir. 2005) ("[T]he decision to impound pursuant to the authority of a city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment…")).

As to the second prong, the Tenth Circuit admitted that determining whether police were acting pursuant to a reasonable, non-pretextual community-caretaking rationale is "not an easy task." *Id.* It accordingly presented a non-exhaustive list of five factors to consider in deciding whether that prong has been met: (1) whether the vehicle was on public or private property; (2) if on private property, whether the property owner was consulted; (3) whether an alternative to impoundment existed (especially another person capable of driving the vehicle); (4) whether the vehicle was implicated in a crime; and (5) whether the vehicle's owner and/or driver has consented to the impoundment. *Id.* at 1250.

# DISCUSSION

## I.     Constitutionality Under *Opperman*

The Court first finds that, as in *Ibarra*, the government has not carried its burden of showing that Deputy Skroch's decision to impound Mr. Trujillo's car was justified by the need to protect public safety or to facilitate the flow of traffic under *Opperman*.  *See Ibarra*, 955 F.2d at 1410. The instant case did not involve a vehicle stopped dangerously on the shoulder of a highway; disabled by an accident; left unattended, as in *Opperman* itself; or impeding traffic on a busy road. It involved a car stopped in an entranceway to a gated community in the middle of the night.  While the Mustang did not stop completely along the curb, it could have easily been moved there by the deputies or by Mr. Trujillo himself, who remained on scene.   Moreover, Deputy Skroch's statement that traffic coming into the gated community could not have gotten around the Mustang even if it had been moved [Doc. 57 at 15:16–17, 20:21–24] is not persuasive because it is contradicted by the picture taken later by the defense, which shows two vehicles fitting comfortably side-by-side on the entrance half of the roadway.  Doc. 43 Ex. 1.  The deputy's statement about commuter traffic picking up around the time of the stop is also not particularly credible given that the stop occurred in the middle of the night.  Doc. 57 at 20:10–12.

Nor do the firearms discovered in the car meaningfully change the analysis.  First, Deputy Skroch testified that he made the relevant Fourth Amendment decision–the decision to impound Mr. Trujillo's vehicle–before he saw the firearms.  Doc 57. at 35:18–24.  They are therefore not a relevant consideration in assessing the reasonableness of his decision to impound the car.  Second, the Court finds that the firearms would not have given Deputy Skroch automatic grounds to impound the vehicle under *Opperman* even if he was aware of them when he decided to tow it. While auto-burglary is undoubtedly a serious problem in Bernalillo County, having a vehicle

towed is not the only or most reasonable way to prevent it or to protect valuables left therein. Deputy Skroch and his partner seemingly could have addressed this concern by allowing Mr. Trujillo to secure the weapons some other way or by transporting them to the station for safekeeping when they transported Mr. Trujillo, as officers must do when they arrest a person on the street who happens to be in possession of a firearm. *Accord Ibarra*, 955 F.2d at 1410 (noting that the defendant was "clearly capable of making the arrangements for the safekeeping of his belongings."). That decision would have saved the deputies time, it would have likely saved the county the money spent on the impoundment, and, most importantly, it would have shown due respect for Mr. Trujillo's Fourth Amendment right to be free from an unreasonable and warrantless search of his vehicle.

While the Court respects law enforcement's authority to impound vehicles when doing so is necessary to protect the community, it also bears in mind the Tenth Circuit's warning in *Pappas* that *Opperman*'s justifications were "too carefully crafted" to apply in every case. 735 F.2d at 1234. It accordingly finds that the government has not carried its burden of showing that the impoundment of Mr. Trujillo's vehicle was justified under *Opperman*. 428 U.S. 364; *see also Ibarra*, 955 F.2d at 1410.

## II. Constitutionality Under *Sanders*

The Court additionally finds that the impoundment of Mr. Trujillo's vehicle does not survive Fourth Amendment scrutiny under the test laid out in *Sanders*. The government has satisfied *Sanders*' first prong because it is clear that Deputy Skroch's decision to impound the vehicle was guided by a "standardized policy"–specifically, Sections 311.1(D) and 311.2(D) of the Bernalillo County Sheriff's Department's Rules and Regulations, which required him to tow the car because a verified, registered owner was not present at the time of arrest. Doc. 17 Ex. 1 at

1–2. However, as the Tenth Circuit in *Sanders* made clear, the existence of a standardized policy is only one half of the analysis, and an impoundment pursuant to a policy that calls for the towing of all vehicles incident to arrest can still be found unreasonable.[4] *See id.* at 796 F.3d at 1249.

Where the government has failed to carry its burden in this case is under *Sanders'* second prong, which requires it to demonstrate a reasonable, non-pretextual community-caretaking rationale justifying the decision to impound. *Id.* at 1250. Applying the factors enumerated therein, the Court first finds that the government has not established that the entranceway to the gated community was in fact a public road. *Id.* Although Deputy Skroch testified that he believed the entranceway to be public because it was close to an active roadway and accessible to the public, he conceded that the same things can be true of a private parking lot. Doc. 57 at 28:16–21, 28:24–25, 29:1–5. This factor does not cut strongly one way or the other: Mr. Trujillo's car was not legally parked in a private lot as in *Sanders*, 796 F.3d at 1250, but it also was not stopped on a heavily trafficked public road.

*Sanders*' second factor also does not weigh heavily in either direction because it is unclear whose property the vehicle was on for the purpose of contacting the property owner. *See id.* The Court notes, however, that there is no indication Deputy Skroch attempted to inquire with the

---

[4] The defense has argued that a policy that calls for the impoundment of all vehicles incident to arrest is facially invalid under *Sanders*. *See, e.g.,* Doc. 59 at 4. The Court does not read *Sanders* to mandate such a result; instead, it reads *Sanders* to permit a reviewing court to look through such a policy and proceed to assessing whether the impoundment was reasonable under the facts of the case. Although the Court takes that route here, it remains concerned about the legality of the Sheriff's Department's impoundment policy in general. The Court was particularly troubled by the testimony of Deputy Skroch and Captain Taylor that, pursuant to the policy, vehicles are towed in almost every case of arrest, regardless of the circumstances. *See* Doc. 30 at 49:12–19; Doc. 57 at 30:1–5. When combined with the County's inventory policy, that means that Bernalillo County Sherriff's Deputies are conducting warrantless searches of vehicles in almost every case of arrest, making such searches the rule rather than the "carefully drawn" exception. *Jones v. United States,* 357 U.S. 493, 499 (1957). Although the Court declines to rule on the facial validity of the Sherriff's Department's policy here, it notes the Supreme Court's recent clarification that "facial challenges under the Fourth Amendment are not categorically barred or especially disfavored." *City of Los Angeles v. Patel,* 135 S.Ct. 2443, 2449 (2015). If the same policy continues to remain in effect and continues to subject motorists in Bernalillo County to automatic impoundments and warrantless inventory searches in almost every case of arrest, an analysis of the policy's facial validity may be in order.

management or security of the gated community about leaving the vehicle parked along the curb or moving it just inside the gate.

The Court further finds that the fourth *Sanders* factor, whether the vehicle was implicated in a crime, is somewhat inconclusive but does not lend much support to the decision to impound. *Id.* While the Mustang was implicated in a crime insofar as Mr. Trujillo was driving it when he reportedly failed yield to the deputies' emergency lights, that does not make the vehicle physical evidence to be logged and preserved in the same way it would be if a violent crime happened in it or if it were suspected to be involved in a criminal accident like a hit-and-run. Moreover, to the extent the vehicle eventually became evidence of drug-trafficking [Doc. 57 at 31:2–5], that only happened once Deputy Skroch discovered the methamphetamine in Mr. Trujillo's locked backpack, which occurred long after the decision to impound enabled him to begin searching the vehicle in the first place. *See* Doc. 31 at 4–5. Allowing the later-discovered fruits of the search to justify the deputy's decision to impound the vehicle would be allowing the ends to justify the means in a way the Fourth Amendment does not allow. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 27–28 (1968) (search must be reasonable at its inception).

Finally, the Court finds that the remaining two factors–consent and the exploration of alternatives–cut strongly against the government, a result made inevitable by the automatic nature of the Department's impoundment policy. First, Deputy Skroch testified that he "never asked" for Mr. Trujillo's consent to tow the vehicle. Doc. 57 at 44:2. Second, there is no indication that the deputy considered, or allowed for the consideration of, any alternatives to towing, such as allowing Mr. Trujillo to arrange for someone else to pick up the vehicle, allowing him to contact a private tow company, or allowing him to park the vehicle along the curb or somewhere nearby. The defense proffered in its Reply Motion, for example, that the private security company that patrolled

the gated community could have requested a private tow for the vehicle. Doc. 48 at 6. While the Court agrees with the government that *Sanders* does not create an absolute requirement that officers consider alternatives prior to towing, the Tenth Circuit has made clear both in *Sanders* itself and the cases cited therein that the consideration of alternatives is a critical factor in determining whether an officer's decision to impound was reasonable under the Fourth Amendment. *See id.* at 1251 (noting that the police "impounded Sanders' vehicle without offering her the opportunity to make alternative arrangements"); *Ibarra*, 955 F.2d at 1410 (citing with approval the district court's reasoning that "[i]f in fact a need existed for [defendant] to move his vehicle, he was plainly capable of making those arrangements with a private towing service of his choice to a destination of his choice"); *Pappas*, 735 F.3d at 1234 (quoting the district court's discussion of unexplored alternatives including leaving the vehicle where it was parked, handing over custody to the defendant's friends, or placing a calling to his family). By deciding to tow Mr. Trujillo's vehicle under the policy "as soon as the handcuffs were on," Deputy Skroch completely bypassed the consideration of alternatives and the issue of consent. Doc. 57 at 34:6. These two factors accordingly cut against the existence of a reasonable, non-pretextual community-caretaking rationale justifying the decision to impound. *Sanders*, 796 F.3d at 1250.

On the whole, the Court finds that the government has failed to carry its burden of establishing that Deputy Skroch's decision to impound Mr. Trujillo's vehicle was reasonable and constitutional under *Sanders*. *Id.* at 1244 (the government bears the burden of proving that its decision to impound a vehicle was constitutional). Although the deputy ordered the impoundment pursuant to a standardized policy, the automatic nature of that policy foreclosed the consideration of reasonable alternatives and bypassed the issue of Mr. Trujillo's consent. Nor has the government established that the other factors surrounding the impoundment, such as the vehicle's

location or its status as evidence of a crime, gave rise to a reasonable, non-pretextual community caretaking rationale to justify the towing. The Court accordingly finds that the impoundment was unconstitutional. *Id*. at 1251.

### III. Suppression Remedy

Under the fruit of the poisonous tree doctrine, evidence discovered "as a result of a search in violation of the Fourth Amendment must be excluded." *Oregon v. Elstad*, 470 U.S. 298, 305–06 (1985) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). A defendant has the initial burden of establishing the causal connection between an illegal search and the evidence he seeks to suppress. *See United States v. Shrum*, 908 F.3d 1219, 1233 (10th Cir. 2018) (citing *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006)). The burden then shifts to the government to establish that the incriminating evidence was discovered by means "sufficiently distinguishable from the initial illegality to be purged of the primary taint." *Shrum*, 908 F.3d at 1233 (citing *Wong Sun*, 371 U.S. at 488). If the government can demonstrate "inevitable discovery, discovery by independent means, or attenuation, the evidence is not fruit of the poisonous tree and need not be suppressed." *Torres-Castro*, 470 F.3d at 999.

Mr. Trujillo argues that "all of the evidence obtained in [the] inventory" completed by Deputy Skroch after his decision to impound the vehicle must be suppressed. Doc. 43 at 2. The Court agrees. As in *Ibarra*, "no inventory of the contents of [Mr. Trujillo's] vehicle could have been conducted but for the unlawful impoundment." 955 F.2d at 1210. Nor has the government argued that the incriminating evidence would have been discovered inevitably or through independent means. The fruits of Deputy Skroch's inventory search, including the methamphetamine, the 1911 handgun, and the U.S. currency found in the green backpack, will accordingly be suppressed.

**CONCLUSION**

For the foregoing reasons, Defendant Gabriel Trujillo's Second Motion to Suppress Evidence [Doc. 43] is hereby **GRANTED**.

Dated this 20th day of November, 2019.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

Ryan J. Villa                                    Paul Mysliwiec
*Attorney for Mr. Trujillo*                   *Assistant United States Attorney*